UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TENNESSEE

SOUTHERN DIVISION

| | | |
|---|---|---|
| In re UNUMPROVIDENT CORP. SECURITIES LITIGATION | ) | Master File No. 1:03-CV-0049 |
| | ) | CLASS ACTION |
| This Document Relates To: | ) | Judge Collier<br>Magistrate Judge Shirley |
| ALL ACTIONS. | ) | DECLARATION OF LAURIE KRIGMAN, Ph.D. ON MARKET EFFICIENCY |

## I. SCOPE OF ENGAGEMENT AND DECLARATION

1. I was retained by the law firm Lerach Coughlin Stoia Geller Redman & Robbins, LLP to opine on the market efficiency of the common stock of Unumprovident Corporation ("Unum" or "the Company") between March 30, 2000 and April 23, 2003 (the "Class Period").

2. My opinions are based on my education, professional experience, and a review of relevant court filings, analyst reports, stock price data, and academic articles. The opinions expressed in this declaration are a result of the information available to me as of the declaration date, and I retain the right to supplement or modify my opinions if new information comes to light. A list of the documents I have considered for use in this declaration is contained in Exhibit 1.[1] In accordance with recognized professional ethics, my professional fees for this service are not contingent upon the opinion expressed herein. My time on this matter is billed at the rate of $400 per hour.

## II. PROFESSIONAL QUALIFICATIONS

3. I am the holder of the Peter Black Senior Term Chair and Associate Professor of Finance at Babson College. Prior to joining the faculty at Babson College I was an Eller Center Scholar at the Eller College of Business and Public Administration at the University of Arizona. I have also been employed as a portfolio manager for Trinity Investments Corporation. My academic research has been in the area of corporate finance, the pricing, timing and trading behavior surrounding initial public offerings and regulatory, trading and pricing effects of open market repurchase programs.

---

[1] I was assisted in this matter for data compilation and administrative services by The Michel-Shaked Group.

4. I have received grants from both the NYSE and the NASDAQ Educational Foundation to study stock reactions, trading activity, and liquidity surrounding repurchase trading, and exchange listing decisions at the time of IPOs. My curriculum vita is attached as Exhibit 2.

## III. MARKET EFFICIENCY FOR UNUMPROVIDENT STOCK

### Indicators of Market Efficiency

5. An efficient market is a market in which available information is incorporated into the trading prices of securities. A security is efficiently priced if its trading price reflects all available information.

6. The definition of market efficiency set forth by Judge Alfred J. Lechner, Jr. in the 1989 decision in *Cammer v. Bloom*, 711 F. Supp.1264 (D.N.J. 1989), is often cited as a legal authority on the meaning of market efficiency and is consistent with the definition generally accepted by the academic finance community:

> "As relevant here, courts have permitted a rebuttable presumption of reliance in the case of securities traded in 'efficient markets' (*i.e.*, markets which are so active and followed that material information disclosed by a company is expected to be reflected in the stock price.)"

*Cammer*, 711 F. Supp. at 1273 (parentheses as in original).

7. Judge Lechner also cites the definitions offered by commentators Bromberg and Lowenfels, and by finance professor Eugene Fama:

> "An efficient market is one which rapidly reflects new information in price."

Bromberg and Lowenfels, cited in *Cammer*, 711 F. Supp. at 1276.

> "A market in which prices always 'fully reflect' available information is called 'efficient'."

Fama, Efficient Capital Markets: A Review of Theory and Empirical Work, 25 Journal of Finance 383, 1970, cited in *Cammer*, 711 F. Supp. at 1280.

8. The Supreme Court in the Basic v. Levinson, 485 U.S. 224 (1988), decision focuses on the same important characteristic at the heart of these definitions of market efficiency:

> "The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business..."

Supreme Court in *Basic* case, 108 S. Ct. at 988-89 (quoted in *Cammer*, 711 F. Supp. at 1276).

9. The *Cammer* opinion lays out five factors that would suggest the market for a security is efficient. The five factors are: (1) trading volume, (2) coverage by securities analysts, (3) number of market makers, (4) eligibility for S-3 registration, and (5) empirical evidence that the security price reacts to material information.

10. According to the *Cammer* opinion, not all five factors are required for an efficient market. Rather, these factors are described as indicative of the degree to which the security market is expected to be efficient:

> "There are several different characteristics pertaining to the markets for individual stocks which are probative of the degree to which the purchase price of a stock should reflect material company disclosures."

*Cammer* Opinion 711 F.Supp. at p. 1283.

11. In fact, the way the five factors are described in the *Cammer* opinion suggests that these five conditions are more akin to sufficient conditions individually, rather than necessary conditions collectively. The *Cammer* opinion describes the nature of the five factors as follows:

> "There are several types of facts which, if alleged, might give rise to an inference that Coated Sales traded in an efficient market. It is useful to set forth an explanation of how the existence of such facts would cause the understanding that disclosed company information (or misinformation) would be reflected in the company's stock price, the underpinning of the fraud on the market theory. Peil, supra, 806 F.2d at 1160"

*Cammer* Opinion 711 F.Supp. at pp. 1285-86 (footnote omitted).

> "First, plaintiffs could have alleged there existed an average weekly trading volume during the class period in excess of a certain number of shares."

*Cammer* Opinion 711 F.Supp. at p. 1286.

> "Second, it would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period."

Case 1:03-cv-00049 Document 167 Filed 04/20/07 Page 4 of 12 PageID #: <pageID>

*Cammer* Opinion 711 F.Supp. at p. 1286.

> "Third, it could be alleged the stock had numerous market makers."

*Cammer* Opinion 711 F.Supp. at p. 1286.

> "Fourth, as discussed it would be helpful to allege the Company was entitled to file an S-3 Registration in connection with public offerings..."

*Cammer* Opinion 711 F.Supp. at p. 1287.

> "Finally, it would be helpful to a plaintiff seeking to allege an efficient market to allege empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price."

*Cammer* Opinion 711 F.Supp. at p. 1287.

> "As previously noted, one of the most convincing ways to demonstrate efficiency would be to illustrate over time, a cause and effect relationship between company disclosures and resulting movements in stock price."

*Cammer* Opinion 711 F.Supp. at p. 1291.

**Trading Volume**

12. During the Class Period, UnumProvident stock exhibited substantial trading volume. On average, more than 1.1 million shares changed hands daily. The median trading volume was 886 thousand shares. On one day during the period (March 11, 2003), over 12.3 million shares traded. The consistently heavy trading volumes created a liquid market for UnumProvident shares.

13. Consistent with the *Cammer* opinion, the high trading volume of UnumProvident shares is evidence of the market efficiency of UnumProvident stock.

**Analyst Coverage**

14. As one of the leaders in the insurance industry, with market capitalization of $5.7 billion,[2] UnumProvident received significant analyst coverage. According to a search in Thomson Financial Research database, during the class period there were at least 225 analyst reports published

---

2 This figure is the average market capitalization during the Class Period.

about UnumProvident. These reports were authored by analysts from various research firms, including Painewebber, Credit Suisse First Boston ("CSFB"), Smith Barney, and Deutsche Banc. These well-known firms generally issued analyst reports on a regular basis following the release of company earnings announcements and other events.

15. Consistent with the *Cammer* opinion, this broad-based analyst coverage of Unum is evidence of the market efficiency of Unum stock. Further, as an insurance provider, Unum was followed by and rated by A.M. Best. Unum's debt securities were also followed and rated by Moody's and Standard & Poor's.

**Market Makers**

16. Market makers are financial intermediaries who trade in a particular security, standing ready to buy and sell with investors and institutions. Market makers provide liquidity for the securities they deal in on the NASDAQ.

17. Unum stock is and was listed for trading on NYSE. On the NYSE, companies are assigned a specialist who acts as a market maker to facilitate trading. The specialist for Unum during the class period was LaBranche & Co. LLC.

**S-3 Registration**

18. Unum was eligible to file an S-3 registration in connection with public offerings, and in fact did file S-3 registration statements during the class period.

**Empirical Evidence**[3]

19. There are numerous instances when Unum stock exhibited immediate and significant positive reactions to news. For example, on May 4, 2000, after the Company reported positive

---

[3] The returns presented are log-relative returns – that is, the natural logarithm of the ratio of the current day's closing price and dividend to the previous day's closing price.

Case 1:03-cv-00049 Document 167 Filed 04/20/07 Page 6 of 12 PageID #: <pageID>

financial results, Unum stock rose 15.76%. On July 27, 2000 Unum stock rose 16.68% after Donaldson, Lufkin & Jenrette upgraded its rating of Unum to "top pick."

20. Unum stock also exhibited immediate and significant negative reactions to news. On March 10 and 11, 2003, following Moody's announcement that it may lower Unum's credit ratings, the stock fell 45.50% and 29.27%, respectively.

21. There are similar instances of immediate stock price movement with respect to the particular information at issue in this case. For example, Unum issued a press release on October 2, 2002 that addressed the nature of the Company's claims handling process. On October 2, 2002, Unum's stock fell 9.93%. Additionally, when the Company announced its negative financial results for the first quarter of 2003 and its need to bolster reserves on April 25, 2003, Unum stock fell 31.13%.

22. Consistent with the *Cammer* opinion, the timely and appropriate reactions to significant information are evidence of the market efficiency of Unum stock.

**Additional Evidence Supporting Market Efficiency**

23. Institutional investor holdings in a company also contribute to that company's stock trading in an efficient market. These investors are highly sophisticated and respond to new information, improving the efficiency level of the market for the company's stock. During the Class Period , there were 279 institutional holders of Unum's common stock, holding a combined 219.6 million shares. This represents an 88.0% of the 249.5 million shares of Unum's stock issued.

**Conclusion**

24. Based on the foregoing analysis, my findings indicate that Unum's stock met all five criteria laid out in the *Cammer* opinion as well as additional considerations to support market

efficiency during the Class Period.[4] It is my opinion that Unum's common stock traded in an efficient market during the Class Period.

## IV. LIMITING FACTORS AND OTHER ASSUMPTIONS

25. This declaration is furnished solely for the benefit of counsel and the Court, in the matter of Unumprovident Securities Litigation. In accordance with recognized professional ethics, my professional fees for this service are not contingent upon the opinion expressed herein, and I do not have a present or intended financial interest in the outcome of this matter.

26. Public information, statistical information and data are from sources I deem to be reliable. However, I make no representation as to the accuracy or completeness of such information and data, and have accepted the information and data without further investigation.

27. It should be understood that I have reviewed numerous documents related to this matter and I have set forth in this declaration only a summary of the testimony I may provide at trial. I have not attempted to set forth verbatim every fact that supports my opinion. I reserve the right to supplement or amend this declaration should any additional information become available.

---

4 The measurements date for this data was March 31, 2003, the last quarter reported before the end of the Class.

28. I declare under penalty of perjury, under the laws of Tennessee and the United States that the foregoing is true and correct. If called as a witness, I could and would testify competently thereto.

Respectfully submitted,

Laurie Krigman, Ph.D.
April 20, 2007

CERTIFICATE OF SERVICE

I hereby certify that on April 20, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on April 20, 2007.

s/ Andrew J. Brown

ANDREW J. BROWN

LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone: 619/231-1058
619/231-7423 (fax)

E-mail:andrewb@lerachlaw.com

# Mailing Information for a Case 1:03-cv-00049

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Michael A Anderson**
  manderson@chattanooga-law.com,skabalka@chattanooga-law.com
- **George E Barrett**
  gbarrett@barrettjohnston.com
- **Jeffrey C Block**
  jblock@bermanesq.com,smelloul@bermanesq.com
- **Paul K Bramlett**
  PKNASHLAW@aol.com
- **Andrew J Brown**
  andrewb@lerachlaw.com,e_file_sd@lerachlaw.com
- **Edward P Dietrich**
  edd@lerachlaw.com
- **Kathleen M Donovan-Maher**
  kdonovanmaher@bermanesq.com
- **William H Horton**
  whorton@chattanooga-law.com
- **Douglas S Johnston , Jr**
  djohnston@barrettjohnston.com
- **John P Konvalinka**
  jkonvalinka@gkhpc.com
- **Timothy L Miles**
  tmiles@barrettjohnston.com
- **Julie A Richmond**
  jrichmond@bermanesq.com,smelloul@bermanesq.com,bdentremont@bermanesq.com
- **Bryan A Wood**
  bwood@bermanesq.com,smelloul@bermanesq.com,jwalker@bermanesq.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into

your word processing program in order to create notices or labels for these recipients.

**Ramzi Abadou**
Milberg, Weiss LLP
655 W. Broadway
Suite 1900
San Diego, CA 92101-8590

**Javier Bleichmar**
Bernstein, Litowitz, Berger & Grossman, LLP
1285 Avenue of the Americas
33rd Floor
New York, NY 10019-6028

**Buckley P Hollister**
Milberg Weiss Bershad Hynes & Lerach, LLP
401 B Street
Suite 1700
San Diego, CA 92101-4297

**Roger J LeBlanc**
LeBlanc & Waddell
5353 Essen Lane
Suite 420
Baton Rouge, LA 70809

**Douglas M McKeige**
Bernstein, Litowitz, Berger & Grossman, LLP
1285 Avenue of the Americas
33rd Floor
New York, NY 10019-6028

**Eitan Misulovin**
Bernstein, Litowitz, Berger & Grossman, LLP
1285 Avenue of the Americas
33rd Floor
New York, NY 10019-6028

**J William Pope , Jr**
Ward Crutchfield & Associates
707 Georgia Avenue
Suite 301 Flatiron Building
Chattanooga, TN 37402-2047